UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DANA HALE AND WILLIAM PRUESNER,
as co-personal representatives of
the ESTATE OF CHRISTOPHER FISHER,

                Plaintiffs,                        Hon. Jane M. Beckering

v.                                         Case No. 1:23-cv-1063

CLINTON COUNTY, et al.,

                Defendants.
_____/

## OPINION AND ORDER

      Plaintiffs, Dana Hale and William Pruesner, in their capacities as personal representatives for the estate of Christopher Fisher, filed this action pursuant to 42 U.S.C. § 1983 against several defendants following Mr. Fisher's tragic death at the Clinton County Jail.  Pending before the Court is a motion for summary judgment filed by Defendants Clinton County, Chad Bashore, Jeffrey Armbrustmacher, Devin Hummel, Alexis Chapko, and Chad Hallock. (ECF No. 41).   For the reasons stated below, Defendants' motion is granted in part and denied in part.

## I.      BACKGROUND

### A.  Factual Background

      On December 13, 2022, Michigan State Police stopped an unlicensed vehicle driven by Mr. Fisher's girlfriend.  (ECF No. 43-8 at PageID.780, 783).   Mr. Fisher was a passenger in the vehicle. (*Id.* at PageID.780). During the traffic stop, police learned that Mr. Fisher had an outstanding warrant from Washtenaw County stemming from a probation violation.  (*Id.*)  Mr. Fisher was arrested and transported to the Clinton County Jail (the "Jail"). (*Id.*)

At 2:42 P.M., Mr. Fisher arrived at the Jail, and Defendant Armbrustmacher was Mr. Fisher's initial booking officer.  (*Id.* at PageID.807).   The video of the initial booking process shows Mr. Fisher arrived at the Jail in handcuffs and Defendant Armbrustmacher removed them. (ECF No. 41-31 at 0:22-2:12).   Mr. Fisher then took off his hat, sweatshirt, and boots and gave them to Defendant Armbrustmacher.  (*Id.* at 2:20-3:00).   He also emptied his pockets, placed a few items on the counter, and removed his belt.  (*Id.*)   Defendant Armbrustmacher conducted a pat down search of Mr. Fisher before sending him to Receiving Cell 5 ("Cell R5"). (*Id.* at 3:50-4:10). Defendant Bashore was also present during the pat down search but does not appear in the video.  (ECF No. 41-6 at PageID.361).   Defendant Bashore later conducted a medical screening of Mr. Fisher. (ECF No. 41-2 at PageID.272-273).   During the questioning, Mr. Fisher denied drug use and denied that he needed any medical attention.  (*Id.*)   Defendant Bashore did not observe any unusual behavior that would suggest drug use. (*Id.*)

Mr. Fisher remained in Cell R5 for the duration of his incarceration.   The booking officers are responsible for supervising this receiving cell. They are required to conduct rounds of the receiving cell, make observations of each inmate, and perform a headcount at least hourly. (ECF No. 41-2 at PageID.245). Cell R5 is situated directly adjacent to the officers' booking cage and has three observation windows.   During the relevant time period, Cell R5 housed between three and six individuals, including Mr. Fisher. (ECF No. 43-11 at PageID.863-867).   A video camera monitors the cell 24 hours per day and records when there is movement inside. (ECF No. 41-2 at PageID.245).

2

The video of Cell R5 shows the following.[1]  Mr. Fisher entered the cell around 2:50 P.M. (ECF No. 41-29 at 00:00-7:00). He appeared normal and talked with other inmates. (*Id.*)   He is then removed for a couple minutes to complete the booking process and returned back to the cell at 3:12 P.M. (ECF No. 41-20 at PageID.509).   At 3:23 P.M., Mr. Fisher covered himself with his blanket for what appears to be about a minute. (ECF No. 41-29 at 14:48-15:36).   Investigators later hypothesized that Mr. Fisher may have taken drugs while under the blanket.   (ECF No. 43-8 at PageID.806).   Mr. Fisher then sat up, talked to other inmates, wandered around the cell, and used the telephone. (ECF No. 41-29 at 16:15-50:10).   Around 4:30 P.M., dinner trays were passed out, and Mr. Fisher ate his dinner sitting up while talking to other inmates. (ECF No. 41-29 at 50:15-1:29:16; ECF No. 41-20 at PageID.509). Shortly thereafter, Mr. Fisher laid back down on his mat.

As the video continues, Mr. Fisher begins to exhibit unusual behavior.   At 6:09 P.M., Mr. Fisher sat up on his mat. (ECF No. 41-29 at 1:29:16; ECF No. 43-8 at PageID.806).   He started scratching himself, covering his head with his hands, and swaying back and forth. (*Id.* at 1:31:50-1:32:30). He stood up, stumbled, looked very disoriented, and then sat back down.   (*Id.*).   He stood up again and struggled to walk to the toilet.   (*Id.* at 1:51:33-1:52:06).   Once at the toilet, he braced himself with his hands on the walls and appeared as if he was going to throw up.   (*Id.* at 1:52:06-1:53:35).   He then stumbled back to his mat before sitting down in an upright position.

---

[1]  The Court notes that it is difficult to determine the exact time of the events shown in the video because the video is not timestamped. Nonetheless, the time of some events can still be determined. For example, the video shows dinner trays being passed out at 50:15. (ECF No. 41-29 at 50:15:00). The police investigation notes that a corrections officer opened the cell door at 4:28:35 P.M. to pass out dinner trays. (ECF No. 41-20 at PageID.509). Thus, the Court concludes that dinner occurred around 4:30 P.M.

(*Id. at* 1:53:35-1:54:00). He sat there with his head nodding and his mouth open. (*Id.* at 1:54:00-1:56-15).

At one point, another individual is removed from the cell. (*Id.* at 1:58:10-2:00:56). While the other individual is leaving, Mr. Fisher is sitting up, holding his arm out, mouth open, nodding back and forth, and eventually covering his head with his hands. (*Id.*)   For approximately the next fifteen minutes of the video, Mr. Fisher continued to sway back forth with his mouth open until he appears to pass out leaning up against the wall. (*Id.* at 2:00:00-2:14:00).   Moments later, he started to lie down but kept his head up with his mouth open and grabbed his head with one hand. (*Id* at 2:18:10-2:22:00). Around 7:45 P.M., Mr. Fisher laid down with his head on the blanket. (ECF No. 41-29 at 2:22:20; ECF No. 43-8 at PageID.806). He does not move again.

The next morning, Sergeant Richard Stout delivered breakfast to Cell R5 around 6:30 A.M. (ECF No. 43-4 at PageID.681).   Mr. Fisher was the only inmate that did not move or eat breakfast. (ECF No. 42-30 at 1:00:00-1:05:00).   At 9:36 A.M., Sergeant Stout noticed Mr. Fisher "did not look right." (ECF No. 43-13 at PageID.893).   He looked through an observation window and could not tell whether Mr. Fisher was breathing. (ECF No. 43-4 at PageID.685).   He then entered the cell and kicked Mr. Fisher's mattress, but Mr. Fisher did not move. (*Id.*).   When Sergeant Stout moved Mr. Fisher's blanket, he saw purple discoloration on Mr. Fisher's neck.   (ECF No. 43-13 at PageID.893).   He then called for medical attention. (*Id.*) Despite lifesaving efforts, Mr. Fisher had passed away.   (ECF No. 43-4 at PageID.686-687).

The autopsy report revealed that Mr. Fisher died of a drug overdose of methamphetamine and fentanyl. (ECF No. 41-23 at PageID.528). A small piece of Michigan lottery paper was found in his stomach. (*Id.* at PageID.531). Another medical doctor opined that Mr. Fisher died of a

fentanyl overdose and "its physiologic features were delayed and masked by the concomitant ingestion of methamphetamine as well as the delayed oral absorption of fentanyl." (ECF No. 41-24 at PageID.535).

Following Mr. Fisher's death, the Michigan State Police, led by Detective Sergeant Kailee Schuett and assisted by Detective Sergeants Issac Mills and Andrew Adamczyk, conducted an investigation into Mr. Fisher's death.  The investigation uncovered some important details relevant to this lawsuit.  First, Det/Sgt. Schuett interviewed Mr. Fisher's girlfriend. (ECF No. 43-8 at PageID.783).  Mr. Fisher's girlfriend reported that (1) Mr. Fisher previously used methamphetamine but stopped a week before his arrest; (2) she asked Mr. Fisher if there were any drugs in the car during the traffic stop and Mr. Fisher responded that there was a "bubble of ice" under the front seat; and (3) after Mr. Fisher was arrested, she looked for the methamphetamine in the car but did not find anything. (*Id.*) Second, investigators examined Mr. Fisher's property seized at the Jail and discovered a plastic tube in the pocket of Mr. Fisher's sweatshirt that appeared to have drug residue on it. (*Id.* at PageID.787). Third, investigators interviewed the other inmates in Cell R5 and some reported noticing Mr. Fisher acting unusual and appearing to be on drugs. (ECF No. 43-16 at PageID.940, 961, 964).

## B. Procedural Background

On January 19, 2024, the personal representatives of Mr. Fisher's estate filed a two-count amended complaint.  (ECF No. 21).  Plaintiffs allege deliberate indifference to serious medical needs in violation of the Fourteenth Amendment against the individual Defendants (Count I), and a municipal/supervisory liability claim against Clinton County (Count II). (*Id.* at PageID.100-106).

Defendants have moved for summary judgment. (ECF No. 41).   Plaintiffs filed a response in opposition (ECF No. 43), and Defendants filed a reply (ECF No. 44).   Having considered the parties' submissions, the Court concludes that oral argument is unnecessary to resolve the issues presented. *See* W.D. Mich. LCivR 7.2(d).

## II.   LEGAL STANDARD

Summary judgment "shall" be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).   Whether a fact is "material" depends on "whether its resolution might affect the outcome of the case." *Harden v. Hillman*, 993 F.3d 465, 474 (6th Cir. 2021).

A party moving for summary judgment can satisfy its burden by demonstrating that the non-moving party, "having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case." *Minadeo v. ICI Paints*, 398 F.3d 751, 761 (6th Cir. 2005). Once the moving party makes this showing, the non-moving party "must identify specific facts that can be established by admissible evidence, which demonstrate a genuine issue for trial." *Amini v. Oberlin College*, 440 F.3d 350, 357 (6th Cir. 2006).   The existence of a mere "scintilla of evidence" in support of the non-moving party's position, however, is insufficient.   *Daniels v. Woodside*, 396 F.3d 730, 734-35 (6th Cir. 2005).

While the Court must view the evidence in the light most favorable to the non-moving party, that party "must do more than simply show that there is some metaphysical doubt as to the material facts."   *Amini*, 440 F.3d at 357.   The non-moving party "may not rest upon [his] mere allegations," but must instead present "significant probative evidence" establishing that "there is a genuine issue for trial." *Pack v. Damon Corp.*, 434 F.3d 810, 813-14 (6th Cir. 2006).   Likewise,

6

the non-moving party cannot merely "recite the incantation, 'credibility,' and have a trial on the hope that a jury may disbelieve factually uncontested proof." *Fogerty v. MGM Group Holdings Corp., Inc.*, 379 F.3d 348, 353-54 (6th Cir. 2004).

Accordingly, summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Daniels*, 396 F.3d at 735. Stated differently, the "ultimate question is whether the evidence presents a sufficient factual disagreement to require submission of the case to the jury, or whether the evidence is so one-sided that the moving parties should prevail as a matter of law." *Harden*, 993 F.3d 465 at 474.

## III.    ANALYSIS

In Count I, Plaintiff alleges a deliberate-indifference claim against the individual Defendants. In Count II, Plaintiff alleges a municipal/supervisory liability claim against Clinton County. The Court addresses each count in turn.

### A.  Count I: Deliberate Indifference

Pretrial detainees "have a Fourteenth Amendment right not to be 'deprive[d]' of their 'life' 'without due process of law.'" *Lawler v. Hardeman Cnty.*, 93 F.4th 916, 926 (6th Cir. 2024) (quoting U.S. Const. amend. XIV, § 1). At issue in this case is whether the individual Defendants were deliberately indifferent to Mr. Fisher's serious medical need. To survive summary judgment on a deliberate-indifference claim, the pretrial detainee must "present evidence from which a reasonable jury could find (1) that [he] had an objectively serious medical need; and (2) that [the defendant's] action (or lack of action) was intentional (not accidental) and [the defendant] either (a) acted intentionally to ignore [the detainee's] serious medical need, or (b) recklessly failed to

act reasonably to mitigate the risk the serious medical need posed to [the detainee]." *Mercer v. Athens Cnty.,* 72 F.4th 152, 160-61 (6th Cir. 2023) (quoting *Brawner v. Scott Cnty.,* 14 F.4th 585, 597 (6th Cir. 2021).

### 1. Objective Prong

An objectively serious medical need is one "that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Brawner*, 14 F.4th at 607 (quoting *Harrison v. Ash*, 539 F.3d 510, 518 (6th Cir. 2008)). If the claim involves "minor maladies or non-obvious complaints of a serious need for medical care," the plaintiff must put forth verifying medical evidence to demonstrate an objectively serious medical need. *Burwell v. City of Lansing, Michigan*, 7 F.4th 456, 463 (6th Cir. 2021) (citing *Estate of Carter v. City of Detroit*, 408 F.3d 305, 312 (6th Cir. 2005)).   However, if the claim involves a medical need "'so obvious that even a layperson would easily recognize the necessity for a doctor's attention,'" the plaintiff need not present verifying medical evidence.   *Burwell*, 7 F.4th at 463 (quoting *Blackmore v. Kalamazoo Cnty*., 390 F.3d 890, 895 (6th Cir. 2004).

A death from a drug overdose does not independently establish the objective component. *See Hodges v. Abram*, 138 F.4th 980, 990 (6th Cir. 2025). "'[T]he objective prong is usually met in overdose cases where death results from a failure to provide medical services, and there is evidence that lay persons . . . recognized the necessity for a doctor's attention.'" *Burwell*, 7 F.4th at 464 (quoting *Hinneburg v. Miron*, 676 F. App'x 483, 486-87 (6th Cir. 2017)) (alteration in original). For example, "[i]n *Hinneburg*, 'the extreme nature of [the inmate's] intoxication' met the objective component where other inmates testified that that the deceased inmate was 'visibly

high,' 'nodding out and talking to herself' and repeatedly dropped her head." *Burwell*, 7 F.4th at 464 (citing *Hinneburg*, 676 F. App'x at 484, 486) (alteration in original). Similarly, the Sixth Circuit has found it "incontrovertible that the detainee's symptoms showed . . . a sufficiently serious medical condition, where the detainee, a diabetic who died in custody from heroin withdrawal, vomited (a clear manifestation of internal physical disorder), had diarrhea causing dehydration, and was seen lying on the cell floor." *Burwell*, 7 F.4th at 464 (citing *Preyor v. City of Ferndale*, 248 F. App'x 636, 642 (6th Cir. 2007) (internal quotation marks omitted). However, the obvious existence of a sufficiently serious medical need is not met when medical personnel examined an overdosing detainee and determined that he exhibited no visible signs of an overdose. *Spears v. Ruth*, 589 F.3d 249, 255 (6th Cir. 2009).

Defendants argue that Mr. Fisher did not show any signs of drug overdose, drug induced distress, or drug withdrawal.  He was not arrested on a drug-related crime and had no criminal history related to drugs.  (ECF No. 41-4).  When initially booked at the Jail, Mr. Fisher denied using any drug and denied the need for medical attention.  (ECF No. 41-2 at PageID.272-273). Defendants further argue that after he was placed in the cell, he behaved like a typical inmate— ate a meal; conversed with other inmates; and slept through the night.

Defendants' characterization of the video evidence goes too far.  Although Mr. Fisher may have initially acted like a typical inmate, he began to exhibit clear signs of medical distress around 6:00 P.M.  The video evidence shows Mr. Fisher swaying back and forth; grabbing his head with his hands; scratching himself; struggling to stand up; stumbling while trying to walk; bracing himself by the toilet appearing as if he was going to throw up; passing out while sitting up with his mouth open; and slumping over.  These symptoms occurred consistently over an hour-and-a-

half and resemble common signs of medical distress associated with overdosing. S*ee, e.g.*, *Burwell*, 7 F.4th at 464 (finding that the detainee being "bent at the waist, swaying and rocking on the bench inside his cell, grabbing his head and midsection, dropping his sandwich numerous times, and falling to the floor repeatedly" were clear signs of medical distress associated with overdosing).

Furthermore, the Michigan State Police investigator described Mr. Fisher as "appearing to be on the nod." (ECF No. 43-8 at PageID.806).   Defendant Hummel acknowledged that if an individual is "at the nod point . . . it would be imperative to go and grab the Narcan and give them the Narcan." (ECF No. 43-6 at PageID.735). Defendant Hallock described someone exhibiting symptoms such as head nodding, acting lethargic, and falling over would be an example of a medical emergency. (ECF No. 43-7 at PageID.769). Moreover, one other inmate reported that he thought Mr. Fisher was "fighting" a drug induced high or drug withdrawal. (*See* ECF No. 41-21 at PageID.517).   Finally, although the fact that Mr. Fisher denied drug use may be relevant under the subjective prong, it is "irrelevant when assessing whether [Mr. Fisher] had a serious medical need, given the manifest signs of distress obvious to a layman."   *Grote v Kenton Cnty.,* 85 F.4th 397, 407 (6th Cir. 2023). At a minimum, genuine issues of material fact exist concerning whether Mr. Fisher's medical need was sufficiently serious and obvious to a layman.

### 2.  Subjective Prong

Under the subjective prong, a plaintiff "must show that the individual Defendants recklessly acted or recklessly failed to act where a reasonable official in their position would have recognized that [the detainee's] serious medical need posed 'an unjustifiably high risk of harm.'" *Howell v. NaphCare, Inc.*, 67 F.4th 302, 312 (6th Cir. 2023) (quoting *Brawner*, 14 F.4th at 596-97). It is sufficient that the risk is known by the defendant or "so obvious that it should be known."

*Brawner*, 14 F.4th at 596. "A pretrial detainee must prove more than negligence but less than subjective intent—something akin to reckless disregard." *Id.* (internal quotations omitted). The Court must analyze each Defendant's liability individually because it "cannot 'impute knowledge from one defendant to another[.]'" *Mercer*, 72 F.4th at 161 (quoting *Greene v. Crawford Cnty.*, 22 F.4th 593, 607 (6th Cir. 2022)).

***Defendant Armbrustmacher.*** Defendant Armbrustmacher worked in the booking area of the Jail on December 13, 2022 from the time Mr. Fisher arrived until 6:00 P.M. He conducted the initial search of Mr. Fisher and did not find any contraband.   He also did not make Mr. Fisher turn his pockets inside out during the search.

Plaintiffs take issue with how Defendant Armbrustmacher conducted the initial pat-down search of Mr. Fisher. They believe that Defendant Armbrustmacher should have made Mr. Fisher turn his pockets inside out and looked inside Mr. Fisher's sweatshirt pocket. If he did, Plaintiffs contend that he would have found the pen cap, which resembled drug paraphernalia, and would have led to increased monitoring of Mr. Fisher. However, Plaintiffs' argument regarding the search is at most that Defendant Armbrustmacher was negligent in conducting the pat-down search of Mr. Fisher and missing the pen cap. Allegations of negligence fall short of the deliberate indifference standard. *See Brawner*, 14 F.4th at 596.

Plaintiffs further contend that the Michigan State Police investigation found that Mr. Fisher began exhibiting symptoms at 5:55 P.M., and Defendant Armbrustmacher's shift ended at 6:00 P.M. According to Plaintiffs, Defendant Armbrustmacher should have recognized Mr. Fisher's serious medical need in those five minutes.   But in those five minutes, Mr. Fisher only "start[ed] displaying tendencies consistent with narcotic/opioid (heroin/fentanyl) use."   (ECF No. 41-20 at

11

PageID.510).  Plaintiffs fail to identify the exact symptoms Mr. Fisher exhibited in those five minutes and do not cite the video evidence in their analysis.   For the overwhelming majority of Defendant Armbrustmacher's shift, Mr. Fisher acted like a typical inmate. Mr. Fisher denied drug use and had no history of drug related convictions.   Even if Defendant Armbrustmacher noticed Mr. Fisher "acting goofy" during the final five minutes of his shift, Plaintiffs have not shown that he acted recklessly in the face of an unjustifiably high risk of obvious harm.   (*See* ECF No. 43 at PageID.648).    Accordingly, Plaintiff's deliberate indifference claim against Defendant Armbrustmacher fails.

*Defendant Bashore.* Like Defendant Armbrustmacher, Defendant Bashore worked in the booking area of the jail on December 13, 2022 from the time Mr. Fisher arrived until 6:00 P.M. (ECF No. 41-6 at PageID.345).   He was the classification/screening officer who conducted the medical screening of Mr. Fisher.   (*Id.* at PageID.353, 360).   In response to his medical screening questions, Mr. Fisher denied any drug use and denied needing any medical attention. (ECF No. 41-2 at PageID.272-273).   Defendant Bashore states that he did not observe any concerning behavior. (*Id.*)

Plaintiffs' arguments regarding Defendant Bashore mirror their arguments regarding Defendant Armbrustmacher. Plaintiffs contend that Defendant Bashore was present during the pat-down search and should have recognized Mr. Fisher's medical need in the last five minutes of the day-shift. For the same reasons Plaintiffs' claim against Defendant Armbrustmacher fails, their claim against Defendant Bashore also fails.

*Defendant Hummel.* Defendant Hummel worked in the booking area of the Jail from 6:00 P.M. on December 13, 2022 to 6:00 A.M on December 14, 2022. He specifically reported to the

booking cage, which has security monitors inside. (ECF No. 41-19 at PageID.493). Defendant Hummel conducted the "skin" checks, which required him to physically look into the cell. (ECF No. 41-19 at PageID.496). Mr. Hummel's deposition testimony is confusing, but it appears that he completed the daily log form—requiring hourly rounds—from 7:00 P.M. on December 13, 2022 to 5:00 A.M. on December 14, 2022. (ECF No. 43-6 at PageID.739, PageID.740). On this record, the Court finds that genuine issues of material fact exist. Viewing the evidence in Plaintiffs' favor, a reasonable jury could find that Defendant Hummel recklessly disregarded Mr. Fisher's serious medical need and risk of drug overdose.

*Defendant Chapko.* Defendant Chapko also worked in the booking area at the Jail from 6:00 P.M. on December 13, 2022 to 6:00 A.M. on December 14, 2022. She was responsible for training Defendant Hummel and sat in the booking cage. Defendant Chapko testified that she would have done her initial round of the day around 6:00 P.M but then later clarified that she could not remember if she did "the first round or not." (ECF No. 43-9 at PageID.825, PageID.827). Defendant Chapko does not appear to remember much of the work shift but claims that she did not see Mr. Fisher acting unusual or in need of medical assistance. Nonetheless, she worked in the booking cage and may have conducted at least one round during the time period Mr. Fisher's medical need was sufficiently serious and apparent.   Viewing the evidence in Plaintiffs' favor, a reasonable jury could find that Defendant Chapko recklessly disregarded Mr. Fisher's serious medical need and risk of drug overdose.

*Defendant Hallock.*  Defendant Hallock also worked the night shift with Defendants Chapko and Hallock. He was at the Jail from 6:00 P.M. to 7:00 P.M. on December 13, 2024. (ECF No. 41-11 at PageID.401).   It is not clear where Defendant Hallock was precisely during

13

that time—normally it is just two officers in the booking cage.    (*See* ECF No. 43-9 at PageID.832). Defendant Hallock then left the Jail to conduct a background investigation and returned around 8:30 P.M. (*Id.* at PageID.401).   He worked in his office until after midnight. (ECF No. 43-11. at PageID.402).   Unlike Defendants Hummel and Chapko, there is no evidence to suggest that Defendant Hallock looked into the cell when Mr. Fisher was exhibiting any drug-induced symptoms. Nor is there any evidence that Defendant Hallock observed Mr. Fisher exhibiting any drug-induced symptoms on a security monitor.   Accordingly, Plaintiff's deliberate indifference claim against Defendant Hallock fails.

In sum, evidence indicates Mr. Fisher was exhibiting symptoms of a serious medical need at the time Defendants Hummel and Chapko were monitoring him.   Viewing the evidence in Plaintiffs' favor, a reasonable jury could find that Defendants Hummel and Chapko recklessly disregarded Mr. Fisher's serious medical need and risk of drug overdose.

### 3.  Qualified Immunity

The doctrine of qualified immunity recognizes that government officials must be able to carry out their duties without fear of litigation.   *See Davis v. Scherer*, 468 U.S. 183, 195 (1984). They can do so only if they reasonably can anticipate when their conduct may give rise to liability for damages and if unjustified lawsuits are quickly terminated.   *Id.*   The analysis entails a two-step inquiry. *Martin v. City of Broadview Heights,* 712 F.3d 951, 957 (6th Cir. 2013). First, the Court must "determine if the facts alleged make out a violation of a constitutional right." *Id.* (citing *Pearson v. Callahan,* 555 U.S. 223, 232 (2009)). Second, the Court asks if the right at issue was "'clearly established' when the event occurred such that a reasonable officer would have known that his conduct violated it." *Id.* (citing *Pearson*, 555 U.S. at 232). A court may address these steps

14

in any order. *Id.* (citing *Pearson*, 555 U.S. at 236). A government official is entitled to qualified immunity if either step of the analysis is not satisfied. *See Citizens in Charge, Inc. v. Husted,* 810 F.3d 437, 440 (6th Cir. 2016).

"[U]nder either prong, [however,] courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment." *Tolan v. Cotton*, 572 U.S. 650, 656 (2014). "[C]ourts are required to view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion[,]'" which, "[i]n qualified immunity cases[,] . . . usually means adopting the plaintiff's version of the facts." *Scott v. Harris*, 550 U.S. 372, 378 (2007). A court's failure to do so "reflects a clear misapprehension of summary judgment standards" and the court's consequential decision to grant summary judgment based on qualified immunity must be reversed. *Tolan*, 572 U.S. at 659.

Viewing the evidence in Plaintiffs' favor, Defendants Hummel and Chapko observed Mr. Fisher exhibiting clear manifestations of a serious medical need.  On these facts, Defendants Hummel and Chapko are not entitled to qualified immunity on Plaintiff's deliberate-indifference claim. "[W]here the question of qualified immunity depends on which version of events one accepts, it is the jury's province, not ours, to decide the truth." *Graves v. Malone*, 810 F. App'x 414, 424 (6th Cir. 2020).

## B.  Municipal Liability

Clinton County cannot be held liable "under § 1983 on a respondeat superior theory—in other words, 'solely because it employs a tortfeasor.'" *D'Ambrosio v. Marino,* 747 F.3d 378, 388–89 (6th Cir. 2014) (quoting *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978).  Instead, municipal liability under § 1983 depends on whether the plaintiff's constitutional rights have been

violated as a result of "a 'policy' or 'custom' attributable" to the local government.  *Holloway v. Brush*, 220 F.3d 767, 772 (6th Cir. 2000). "There are at least four avenues a plaintiff may take to prove the existence of a municipality's illegal policy or custom." *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005). The plaintiff can look to "(1) the municipality's legislative enactments or official agency policies; (2) actions taken by officials with final decision-making authority; (3) a policy of inadequate training or supervision; or (4) a custom of tolerance or acquiescence of federal rights violations." *Id.* (citing *Pembaur v. City of Cincinnati,* 475 U.S. 469, 480 (1986)).   Plaintiffs argue that Clinton County is liable under all four theories. Before addressing each theory, the Court must address whether Clinton County is a proper Defendant in this case.

### 1.  Proper Defendant

Defendants contend that Clinton County is not a proper defendant in this case because "[o]peration of the County Jails falls under the jurisdiction and control of the County Sheriff, not the Counties. MCL 51.75, M.C.L. § 51.281", and "[t]he County Sheriff is an independent Constitutional Officer and elected official. MICH. CONST. 1963, Art. VII, § 4." (ECF No. 41 at PageID.228). As pointed out by Plaintiffs, this exact argument has already been rejected by multiple judges in this district.  *See Hehrer v. Clinton Cnty.,* No. 1:20-CV-1079, 2024 WL 4713082, at *10 (W.D. Mich. July 23, 2024), *report and recommendation adopted* No. 1:20-CV-1079, 2024 WL 4532922 (W.D. Mich. Oct. 21, 2024); *Sauvola v. Michigan Dep't of Corrections*, No. 2:20-cv-198, 2021 WL 346245, at *4 (W.D. Mich. Feb. 2, 2021).   Defendants do not address this issue or the previous rulings in their reply brief.   The Court agrees with the other rulings in this District and holds that Clinton County is a proper defendant in this case.

### 2.  Unconstitutional Policy or Procedure

Plaintiffs argue that Clinton County was deliberately indifferent when it enacted three policies. First, the inmate supervision policy requires the corrections officers to "[m]ake a physical visual check (skin) count of inmates once every sixty (60) minutes." (ECF No. 41-2 at PageID.253).  During these "skin" checks, the officers are to ensure that all inmates are where they are supposed to be and that there are no abnormal or concerning behaviors or medical issues. (*Id.*)  The medical screening policy requires a corrections officer to conduct an initial health screening of all inmates at the time of booking and medical staff has up to 14 days to conduct a separate health assessment. (ECF No. 43-19 at PageID.1027).  Lastly, the Jail has a policy of having medical professionals work only the day shift and not the night shift.

An express policy can be unconstitutional in two ways: "(1) facially unconstitutional as written or articulated, or (2) facially constitutional but consistently implemented to result in constitutional violations with explicit or implicit ratification by city policymakers." *Gregory v. City of Louisville*, 444 F.3d 725, 752 (6th Cir. 2006). "Where the identified policy is itself facially lawful, the plaintiff 'must demonstrate that the municipal action was taken with "deliberate indifference" as to its known or obvious consequences. A showing of simple or even heightened negligence will not suffice.'" *Id.* (quoting *Board. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 407 (1997)). Plaintiff must also show that the custom or policy was the "moving force" behind the specific constitutional violation. *Alman v. Reed*, 703 F.3d 887, 903 (6th Cir. 2013).

Plaintiffs attempt to use an expert to show that the County was deliberately indifferent when it enacted the complained of policies. First, their expert states that hourly rounds "should include detailed observations of vital signs like breathing and movement, as well as monitoring

17

for abnormal behaviors, such as unresponsiveness or lethargy." (ECF No. 43-18 at PageID.1020). He states that medical screening of an inmate at booking should be completed by a medical professional, not a corrections officer. (*Id.*) He further states that medical professionals should be staffed in the Jail at all times. (*Id.*)

Plaintiffs' arguments are without merit. First, Plaintiffs cite no case law to support their arguments.   They offer no evidence that the County knew of and disregarded any obvious risk to inmates' constitutional rights to adequate medical care. As pointed out by Defendants, the Sixth Circuit has upheld similar policies. *See Brawner*, 14 F.4th at 600; *Winkler v. Madison Cnty.,* 893 F.3d 877, 885 (6th Cir. 2018).   With regard to the medical professionals conducting the initial screening and medical professionals not working the night shift, Plaintiffs have not shown the polices were the "moving force" behind the specific constitutional violation.   Because Mr. Fisher was not exhibiting any symptoms at 3:00 P.M., whether a booking officer or a medical professional conducted the initial screening is irrelevant. Similarly, the corrections officers are trained in CPR and have access to medical professionals at all times.

Plaintiffs' expert believes that the Jail's policies have inadequacies. He has opined what he believes are the best practices.   However, his opinion alone does not show that Clinton County acted deliberately indifferent. *See Young v. Campbell Cnty.*, 846 F. App'x 314, 330 (6th Cir. 2021) (finding that the expert's testimony regarding the inadequacies of a policy does not show that the county acted with deliberate indifference to the known or obvious consequences of its policies). Accordingly, Plaintiffs' municipal claim based on unconstitutional policies fails.

### 3.  Failure to Train or Supervise

Plaintiffs next argue that the County failed to train jail officials to adequately search new inmates for contraband and to adequately monitor new inmates for health concerns.   "To succeed on a failure to train or supervise claim, the plaintiff must prove the following: (1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury."  *Ellis v. Cleveland Mun. Sch. Dist.,* 455 F.3d 690, 700 (6th Cir. 2006). With respect to their failure to train claim, Plaintiffs do not identify a pattern of similar constitutional violations. Therefore, Plaintiff must prove "deliberate indifference only by showing 'a single violation of federal rights, accompanied by a showing that [the County] has failed to train its employees to handle recurring situations presenting an obvious potential' for a constitutional violation.'" *Grote*, 85 F.4th at 415 (quoting *Shadrick v. Hopkins Cnty.*, 805 F.3d 724, 739 (6th Cir. 2015).   "The need for more or different training [must be] so obvious, and inadequacy so likely to result in a violation of constitutional rights, that policymakers . . . can reasonably be said to have been deliberately indifferent to the need." *City of Canton v. Harris*, 489 U.S. 378, 390 (1989).

Defendants argue that they are sufficiently trained. The State of Michigan mandates training for all corrections officers and each individual Defendant is compliant with that mandatory training. (ECF 41-2 at PageID.247).   All corrections officers are "Academy-trained" and "receive field training to teach them the job, policies, practices, and rules upon hire" (*Id.* at PageID.247-248).

Plaintiffs point to no evidence to refute the evidence of the training. Instead, Plaintiffs experts opine that the training must be inadequate because the individual Defendants did not find

19

the purported drug paraphernalia during the pat-down search and because they did not notice Mr.

Fisher's unusual behavior. This is not enough to show the training was deficient. Plaintiffs have

not explained what proper training the individual Defendants should have received. *See Winkler,*

893 F.3d at 903.   Nor have they explained how the training provided put the County on notice of

the likelihood that jail personnel would respond inadequately to an inmate's medical need. *See id.*

Accordingly, Plaintiffs' failure to train claim fails.

### 4.  Ratification

Plaintiffs next argue that the County ratified unconstitutional conduct by failing to

investigate Mr. Fisher's death.   A plaintiff can demonstrate an illegal policy or custom by showing

that an official with final decision-making authority ratified the conduct. *Burgess v. Fischer*, 735

F.3d 462, 478 (6th Cir. 2013). "To establish that a municipality has ratified illegal actions, a

plaintiff may prove that the municipality has a pattern of inadequately investigating similar

claims." *Stewart v. City of Memphis*, 788 F. App'x 341, 344-45 (6th Cir. 2019) (citing *Leach v.*

*Shelby Cty. Sheriff*, 891 F.2d 1241, 1248 (6th Cir. 1989); *Burgess*, 735 F.3d at 478-79).

"Importantly, there must be multiple earlier inadequate investigations and they must concern

comparable claims."   *Id.*

Here, Plaintiffs identify two other detainees who died at the Jail. But neither one is helpful

to Plaintiffs' ratification argument. One individual died due multisystem organ dysfunction due to

diabetic ketoacidosis in March 2019.   (ECF No. 44-1 at PageID.1081).   The other individual died

nearly two years *after* Mr. Fisher's death.[2]   Notably, there is no evidence that any of the deaths

were inadequately investigated.   The record in the instant case establishes that the Michigan State

---

[2] It does not appear that the cause of death is part of the record.

Police thoroughly investigated Mr. Fisher's death.   Accordingly, Plaintiffs' municipality liability claim based on a ratification theory fails.

### 5.   Custom of Tolerance or Acquiescence of Constitutional Violations

Plaintiffs lastly argue that the County has exhibited a custom of tolerance or acquiescence based on the other two deaths in the Jail. Plaintiffs state that this argument "largely mirrors that of the ratification claim set forth above." (ECF No. 43 at PageID.662). Like a ratification theory, a custom of tolerance theory requires "'a clear and persistent pattern' of rights violations'" *Doe v. Claiborne Cnty.,* 103 F.3d 495, 508 (6th Cir. 1996). As explained above, there is no evidence that any of the deaths are sufficiently comparable. Further, there is no evidence that any death was inadequately investigated.   Accordingly, Plaintiffs' municipality liability claim based on a custom of tolerance theory fails.

### C.  Unknown Parties

Finally, in the amended complaint, Plaintiffs name unknown John Does as Defendants. "Doe defendants are routinely used as stand-ins for real parties until discovery permits the intended defendants to be installed." *Hindes v. FDIC*, 137 F.3d 148, 155 (3rd Cir. 1998) (internal quotation and citation omitted).   The failure to identify and serve a John Doe Defendant constitutes failure to prosecute and warrants a dismissal of that defendant. *See Saucier v. Camp Brighton Prison*, No. 13-15077, 2016 WL 11468926 at *3 (April 26, 2016), *report and recommendation adopted*, 2016 WL 3251761 (E.D. Mich. June 14, 2016). This case has been pending since October 6, 2023. (ECF No. 1). Discovery closed on September 30, 2024. (ECF No. 19). Plaintiffs have made no attempt to amend their complaint to name and serve any John Doe Defendant. The Court, therefore, will dismiss the John Doe Defendants without prejudice.

21

## IV.    <u>CONCLUSION</u>

Accordingly:

**IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment (ECF No. 41) is **GRANTED IN PART** and **DENIED IN PART**.

**IT IS FURTHER ORDERED** that Plaintiffs' deliberate-indifference claim against Defendants Chad Bashore, Jeffrey Armbrustmacher, and Chad Hallock are **DISMISSED WITH PREJUDICE**.

**IT IS FURTHER ORDERED** that Plaintiffs' municipal liability claim against Clinton County is **DISMISSED WITH PREJUDICE**.

**IT IS FURTHER ORDERED** that Plaintiffs' claims against John Doe Defendants are **DISMISSED WITHOUT PREJUDICE**.

The case will proceed on Plaintiff's deliberate-indifference claim against Defendants Devin Hummel and Alexis Chapko.


Dated:   September 16, 2025                     <u>  Jane M. Beckering          </u>
                                                JANE M. BECKERING
                                                United States District Judge